Ronald Lee WOLFE, Petitioner,

v.

Elbert V. NASH, Warden, Missouri State
Penitentiary, Respondent.

No. 13356–3.

United States District Court

W. D. Missouri, W. D.

April 26, 1962.

**220**

James Herd, of Deeba, Sauter & Herd, St. Louis, Mo., for plaintiff.

Ben Ely and George Drapper, Asst. Attys. Gen. of Missouri, Jefferson City, Mo., for defendant.

DUNCAN, Chief Judge.

The Petitioner was charged with statutory rape of an eight year old girl, and tried under the Habitual Criminal Act of Missouri, Section 556.280 [1] RSMO 1949, V.A.M.S. He was found guilty by a jury of the offense of "rape under the statute". The death penalty was imposed by the court.

The petitioner appealed from the judgment and sentence of the court to the Supreme Court of Missouri, and there the judgment of the court was affirmed. State v. Wolfe, 343 S.W.2d 10. The petitioner exhausted all of his remedies, including certiorari to the Supreme Court of the United States, which was denied, and the matter is now before this court on a Petition for Writ of Habeas Corpus.

This court issued a show cause order, and a full and complete hearing was held upon all of the issues raised by the petitioner.

A reading of the record of the trial and of the hearing on the Petition for Writ of Habeas Corpus clearly reveal that the charges in the petition are not borne out by the evidence, and that most of the questions raised therein are not within the jurisdiction of this court.

However, in view of the seriousness of the penalty imposed by the court, I think a full and complete discussion of all the questions raised by the petitioner may be helpful in arriving at a final determination of his fate.

The facts are that the petitioner was released from the United States Penitentiary at Atlanta, Georgia, on Friday, October 16, 1959, after having served for approximately forty months. The prison authorities purchased a bus ticket for him from Atlanta, Georgia, to Montgomery, Alabama. Upon his arrival in Montgomery, he stole an automobile and drove almost continuously back to Georgia and then to Decatur, Illinois, arriving there on Saturday evening, October 17, 1959.

While at Decatur, Illinois, he contacted an individual with whom he had a prior acquaintance, and he purchased from him 20 or 21 one-quarter grain morphine tablets. He also purchased four sticks of benzedrine, each of which was cut into 8 parts. Petitioner states that at the time of the purchase of the morphine, he was given a needle for the purpose of injection, and that he acquired twelve small vials of sterilized water in a container.

Petitioner contends that he took one or two shots of morphine intravenously and some benzedrine before leaving Decatur about 1:00 on Sunday morning, October 18. He drove from there to St. Louis, where he likewise stayed a short period of time, had a sandwich and a cup of coffee and drove from there to Troy, Missouri, the scene of the offense, arriving at Troy some time around 1:00 or 2:00 on the afternoon of the 18th. He states he had taken a morphine tablet either by injection or orally and benzedrine about each four hours from the time he arrived at Decatur, Illinois, un-

1. "556.280. *Second offense, how punished*

"If any person convicted of any offense punishable by imprisonment in the penitentiary, or of any attempt to commit an offense which, if perpetrated, would be punishable by imprisonment in the penitentiary, shall be discharged, either upon pardon or upon compliance with the sentence, and shall subsequently be convicted of any offense committed after such pardon or discharge, he shall be punished as follows:

"(1) If such subsequent offense be such that, upon a first conviction, the offender would be punishable by imprisonment in the penitentiary for life, or for a term which under the provisions of this law might extend to imprisonment for life, then such person shall be punished by imprisonment in the penitentiary for life; * * *."

til the time of his arrival in Troy, and that he took one shot after his arrival that afternoon.

At the time of petitioner's arrival, there was a church carnival in progress, which he attended. The victim, an eight year old girl, was in attendance at the church with her parents. After the evening meal she went outside of the church and there was tempted by the petitioner with a gift of candy. He prevailed upon her to get in his automobile. She first entered the back seat of the car after he told her he would drive her around to the front of the church.

A few minutes after she had entered the back seat, he stopped and she got into the front seat. He drove several miles into the country, and some time around 7:30 p. m. he entered a side road, stopped the car and proceeded to fondle the child in various ways. He fully described his criminal actions and his failure to effect a penetration, in his statement later given to the authorities.

The child was crying and he proceeded toward a farm house approximately two and three quarter miles east of Troy. He let her out with instructions that she ask the people who lived in the house to communicate with her parents and tell them where she was. The farm home had no telephone, but the owners discovered her plight and took her in their car into town and delivered her to her parents.

She immediately reported what had happened to her and was taken to the hospital by her mother, where she was examined by a physician. She was bleeding at the time she was taken to the hospital, and there was considerable blood on her underclothing. Examination disclosed a severe tear of the vagina.

The next morning two physicians proceeded to repair the damage that had been done to her.

Immediately upon her return and reporting what had happened, an alarm was sent out for the person who answered the description of the petitioner. Such a person was seen a short distance from the town attempting to syphon gasoline out of an automobile. He immediately left and was pursued, but was lost in the chase.

Petitioner's evidence reveals that between the time of the commission of the offense and the time he was taken into custody, he had taken one additional shot of narcotics intravenously. He thought it was between Troy and Hannibal.

About 2:00 o'clock in the morning, in the town of Hannibal, approximately 60 miles from Troy, a car answering the description of that driven by the sought person was sighted by cruising officers. They immediately gave chase, at speeds ranging up to 60 or 70 miles an hour, fired a shot, and the pursuit terminated in a dead end street.

Petitioner was arrested in Hannibal about 2:00 a. m. and petitioner says that at the time of his arrest, he was standing beside a truck. The two officers who participated in the arrest said he was under a truck attempting to hide. He was booked at the police station at 2:15 a. m. He says that after the chase started, he threw away the needle and the sterilized water in the container, but that he retained the morphine tablets and the pieces of benzedrine, which were about the size of the rubber on a lead pencil, contained in a small vial in the fly of his trousers.

According to the arresting officers, immediately upon his being taken into the police station, his clothing and belongings were taken from his body for a further search. Nothing in the way of narcotics was found. The clothing was returned after the search.

The evidence further reveals that the State Highway Patrol, the FBI and the officers from Decatur, where the automobile had been stolen, were notified. The State Highway patrolman who first viewed the petitioner at the jail at Hannibal, observed blood on his pants, and asked him where it came from. His answer was that he had had intercourse the night before with a prostitute.

Some time around 9:00 o'clock in the morning, petitioner was interviewed by the local agent of the FBI. This interview was confined exclusively to the theft and transportation of cars, not only the one which he had in his possession at the time of the arrest, but others that had been stolen along the way. He gave a statement of these activities to the agent. The questioning by the agent was confined to questions involving a violation of Federal laws.

Prior to the interview by the FBI, petitioner remained in his cell, and, according to his testimony, took no further narcotics. He says that during this period of time, he was sick, had been vomiting, suffered from diarrhea, was jerky. In other words, he fully and accurately described the symptoms that would follow withdrawal of the use of narcotics from a narcotic addict.

After his interview with the FBI, petitioner's fingerprints were taken, and, according to his own testimony, he went back to the lavatory for the purpose of washing his hands; he says he needed a "fix" by that time, and that he took $\frac{1}{4}$ grain morphine and a piece of benzedrine. Shortly thereafter he was brought back into the chief's office, and the sheriff and deputy sheriff of Lincoln County, the county in which the crime had been committed, began their questioning of him.

After questioning by the officers, he gave them a statement which was written by the deputy sheriff and duly signed by the petitioner. This statement was concluded shortly after noon of October 19. This questioning period lasted about an hour and a half. He was immediately returned to Troy, and a complaint was filed against him charging him with rape, and he was duly arraigned. He did not have counsel.

His bloody clothing was taken away from him in the jail and he was given some other clothing. After his arraignment he was taken by the officers to a clinic in Troy and a doctor took a sample of his blood for purposes of analysis. (This was probably done in violation of his legal rights, but the result of the test did not in any way prejudice his rights, because the question of importance at the time was whether the blood upon his clothing and on the car seat was that of the victim.)

Several days after he was admitted to the jail, he and another prisoner escaped. He was apprehended later in Franklin, North Carolina and returned to Troy. After his return the court appointed two lawyers to represent him and he was arraigned before the Circuit Court of Lincoln County on December 28. He entered a plea of not guilty, and thereafter on January 11, 1960, pursuant to leave of the court, the prosecuting attorney filed an amended information charging the defendant under the Habitual Criminal Act, § 556.280 V.A.M.S. supra, and set out therein the convictions and the times and places thereof.

Shortly thereafter, upon the petitioner's application, a change of venue was granted to Pike County, Missouri, and the case was set for trial on February 29, 1960.

On February 12, 1960, it was determined that the facilities of Pike County jail were inadequate to safely secure the petitioner. He was ordered transferred to the county jail in Montgomery County, there to be held and confined until the further order of the court.

The trial took place on February 29, 1960, before the Honorable James D. Clemens, now deceased. Following the trial of approximately one day, the petitioner was found guilty, as heretofore stated. He sought unsuccessfully to set aside the judgment and conviction in the state court before filing his Petition for Writ of Habeas Corpus on June 1, 1960, in the Supreme Court of Missouri. That petition was filed by his present counsel and it is in almost the exact language as the petition now before this court. His petition was denied by the Supreme Court on June 6, 1960, without a hearing.

Subsequently, on June 13, 1961, petitioner filed a Petition for Writ of Habeas Corpus and Motion for Stay of Execution in this court. The most serious question

raised by petitioner in connection with his trial and conviction was not raised in the Motion for New Trial or on appeal. This issue deals with the voluntariness of his confession and in his "Statement of Points Relied On", petitioner contends:

"1.) The petitioner's conviction was predicated upon an alleged confession which was not voluntary because it was coerced by inspired fear of mob violence and the promise of protection and was the result of a process of exhaustive interrogation over a long period of time in which the petitioner, a person of low level intelligence, was under the influence of narcotics and was without the advice or assistance of counsel.

"2.) The petitioner's conviction was based upon an alleged confession which was never tested for its voluntary character either by the trial court or the jury despite substantial evidence before the trial court that the confession was obtained by state officers under threat of mob violence and promise of protection, was obtained from the petitioner after a long period of interrogation, and was obtained from the petitioner while he was under the influence of narcotics and without the benefit of counsel."

█ If we accept every statement of the petitioner relative to his use of narcotics as true, it would not justify his contention that he was under the influence of narcotics at the time the statement was made. He had not taken a sufficient amount to produce the effect he described.

The evidence of the arresting officer, Don Ve La Porte, police officer on the Hannibal Police Department, was that the petitioner was asked to undress and that no narcotics were found on him. This witness further testified that he observed petitioner in the nude and that petitioner did not have any dilation of the pupils; that he did not seem to twitch; that he did not have any goose pimples; that he was not shivering, and that he did not complain of diarrhea or stomach pains. No needle marks were observed.

Petitioner contends that before and during the conversation with the FBI agent, he was showing the symptoms that normally follow the withdrawal of the use of narcotics from a narcotic addict. The agent however testified that during the time of the interview (from 9:00 a. m. until 11:25 a. m.) the defendant seemed normal, answered questions intelligently, and showed none of the effects of either the use of narcotics or the results of withdrawal of narcotics. The agent was a veteran of almost 20 years.

Jack Steward, City Marshal of Elsberry, Missouri, was present during the hour and one-half afternoon session. He testified at the hearing that the petitioner appeared normal; that his eyes appeared normal and were not bloodshot; and that his speech appeared normal.

Furthermore, the petitioner testified that all during the time he was in the penitentiary at Atlanta, he used narcotics of some type to a certain degree.

It should be noted, however, that after the petitioner's release from prison on Friday, there is no evidence that he had any narcotics until he arrived at Decatur, Illinois, on Saturday evening. Had he been an addict to the degree that he claims to have been, it seems almost incredible that he would not have made some attempt to supply his needs during that long trip alone. Certainly this is not consistent with dope addiction.

The State produced Dr. William J. Kramer, a psychiatrist from the State Mental institution at Fulton, Missouri. He testified that the amount of narcotics the petitioner took, $\frac{1}{4}$ grain morphine, is the usual dose that is given medicinally for analgesic purposes or relaxing purposes and a man given this amount of drug can function in the general way that he always functioned and that it has no degenerating effect on the brain.

The petitioner produced as a witness, Dr. Edith Tuggle, a psychiatrist in St. Louis, who examined petitioner prior to

his trial. She testified that his I. Q. was 90, and that normal was from 90 to 110. Her testimony was that he was not psychotic, but was a psychopath who admitted to having some sexual complexes. She stated that he acknowledged being a homosexual both in and out of prison.

She further testified that in her opinion he at all times knew the difference between right and wrong; that in her opinion the amounts of morphine and other types of drug taken by the petitioner could not have been sufficient to prevent him from knowing at all times what he was doing, and that included the time of the signing of the confession.

Dr. Tuggle also stated that withdrawal symptoms manifested by an addict, appear in approximately 24 hours after the withdrawal of the drug. According to petitioner's own testimony, a twenty-four hour period had never elapsed between one shot and the next. Therefore, it would hardly have been possible for him to have suffered withdrawal symptoms.

Considering all of the evidence in the case, petitioner's testimony with reference to the effect of narcotics upon him, either at the time his statement was given or at any other time is unworthy of belief. However, according to him, the benefit of the most extreme doubt that he had taken some narcotics, it was not in sufficient quantity to have in any wise impaired his faculties or prevent him from knowing at all times what was transpiring.

Petitioner's contention that the confession was coerced by inspired fear of mob violence and the promise of protection, is likewise not borne out by the evidence. There isn't the slightest suggestion that any coercion was used or threats made, that would induce him to make a confession. He does at one place in his testimony say that he was told if he would co-operate, he would be released. In view of the serious nature of the charge, and the very strong evidence against him, this statement is unworthy

of belief, even if it had not been denied by those who are alleged to have made it.

The evidence concerning a mob at Troy shows that the officers were talking among themselves and were some feet away from him at the time. It was not any part of the interrogation which he was undergoing, and it may be inferred that in view of the nature of the offense, the officers were concerned for the safety of the defendant at the time.

■ Petitioner's contention that the confession was the result of a process of exhaustive interrogation over a long period of time contradicts the evidence in the case. The session with the FBI agent took two hours and twenty-five minutes. The afternoon session occupied an hour or an hour and a half. This is clearly not an exhaustive interrogation. This included the time required to typewrite the statement by an inexperienced typist. Petitioner was given coffee and a roll.

The Supreme Court has said that in determining whether a confession is voluntary and free from coercion, the court may take into consideration the age of the accused, his mental capacity, physical condition, familiarity with the language, race, hours of questioning, persons present during the questioning, threats, if any, and the surrounding circumstances.

I have carefully considered every one of the conditions set out above and I fail to find any evidence to justify petitioner's contention that the statement was not freely and voluntarily made, untainted by any threat or promises, or fear, or lack of complete understanding of just what he was saying and doing. I find no evidence of any violation of any of his constitutional rights.

Petitioner's second point that the confession was never tested for its voluntary character by the trial court or the jury, is also in contradiction to the record. When the petitioner's attorney objected to the confession being offered at the time of trial on the grounds that it was not voluntarily given, the court ruled

that "The evidence indicates that the statement was voluntarily made." The Petitioner's next point is as follows:

"3.) The petitioner was denied a fair and impartial trial in that the trial court would not permit an extensive voir dire examination for individual prejudices, and called to the jury panel persons who admitted having formed opinions in the case against him despite widespread community sentiment against the petitioner. Therefore, the voir dire procedure wholly failed to insulate him from prejudice, and required him to select jurors from a panel which was not impartial in its composition."

If I correctly interpret petitioner's contention on this point, he presents, shall we say, a "double-barreled" complaint. He first complains of the manner in which the voir dire examination was conducted by the court. The second complaint is aimed at whether petitioner was denied the right to a fair trial because the publicity was such as to prevent the petitioner from having an impartial jury. The first contention was adequately presented to the court at the time of the voir dire examination, was preserved in the Motion for New Trial and fully reviewed by the Supreme Court on appeal. The examination of jurors on voir dire is a procedural question largely controlled by the trial court. However, this court is bound by the determination of the Supreme Court. In view of the earnestness with which counsel present this question however, and the fact that it may arise for consideration at a later time in the progress of this case, I carefully reviewed the proceedings with respect to the voir dire.

Although the trial court refused to permit defense counsel to ask individual jurors certain questions after such questions had been asked generally by the court, the court was very careful to permit questioning of any juror who expressed an opinion, or whenever it was indicated further questioning was desirable. And, in every instance where a juror stated he or she had a fixed opinion or conviction, such juror was excused. Counsel were not permitted to ask each and every member of the panel whether or not he or she would hold out for acquittal if they believed that the state had not proved the petitioner guilty beyond a reasonable doubt.

It was an improper question in the first place. I think it may reasonably be presumed that jurors who are otherwise qualified in the presence of the court, who take an oath to try the case according to the law and the evidence, may reasonably be expected to follow that oath and the instructions of the court. The jury was told that it was the responsibility of the state to prove the charges against the petitioner beyond a reasonable doubt, and that if they found that the state had failed in that respect, their verdict should be for the petitioner.

One juror, who, upon questioning early in the voir dire stated that he might not hold out for his own belief in the matter if the other members of the jury believed otherwise, was excused temporarily. Later, when the jury panel had been exhausted and by agreement of the parties, he was recalled and permitted to become a part of the panel. Again I can see no legal wrong in this.

I know of no state law that does not give a juror the right to search his mind, if all the other jurors believe differently than he does, to determine whether or not his own belief is one of sincerity based upon real evidence, or is based upon obstinacy. Certainly insofar as the Federal court is concerned, it is a common practice to give what is commonly, and not too favorably looked upon by counsel as the "hammer" instruction, in which the court discusses with the jury the identical question that was raised in this case. It may be referred to as an "anti-hung-jury charge" and may recall to the minds of the old practitioners, the story of the foreman of the jury, who, after long deliberation of the jury, asked the bailiff to bring in "11 lunches and one bale of hay".

I heartily agree with the Supreme Court's disposition of this question, when it had this to say:

"As to the first ruling, it is clear that the court did not cut off further inquiry of the jurors individually on the subject under inquiry, but specifically saved to defendant the right to so inquire as to any who answered in the affirmative to the general question put to the whole panel. We think it clear it is this ruling that is the subject of defendant's attack. But if not, it is manifest that the ruling on the second matter, i. e., undertaking to ask each juror how he would vote in the circumstances there delineated, was not an improper exercise of the court's discretion in determining the qualifications of the prospective jurors."

The next half of petitioner's double-barrel complaint deals with the effect of the publicity upon the minds of the jurors who convicted him.

█ The question here is whether there was a "pattern of deep and bitter prejudice" shown to be present throughout the community which prevented defendant from having a fair trial in violation of his rights under the 14th Amendment. See Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952). This case clearly does not fall within the rule of Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1960), where eight of the twelve persons finally placed in the jury box thought the defendant was guilty.

Having reviewed the newspaper clippings introduced in evidence, I have been rather surprised, considering the nature of the charge, at the mildness of the publicity. I was particularly attracted to articles in two of the papers that were in the middle of the front page where two one column headlines of the page were followed by five or six inches of printed matter, whereas on the other side of the page, in double, screaming headlines gave the results of a local basketball game.

The case had the usual amount of radio and TV coverage. When I say "the usual amount", I mean the amount expected of a crime of this particular type, and was not such as to arouse undue prejudice in the minds of the readers or listeners.

In this modern age of rapid transportation and instantaneous communication, publicity is a problem that courts must face in the administration of justice when crimes and criminals receive so much attention from the press and other media of communication, but if the courts are to say that persons charged with a crime cannot be fairly tried because of the amount of publicity they generally receive, there would be little law enforcement, or little punishment for crime.

It simply casts an added burden upon courts, counsel and law enforcement authorities to minimize the effect of it, and to determine that persons so charged with crime shall be tried by jurors who are free from prejudice and will try the case according to the law and evidence introduced in the case. Certainly there was no attempt on the part of the arresting officers or of the prosecuting attorney to "try their case in the newspapers". Their evidence was clear and convincing, and they exercised commendable restraint and good judgment in keeping the publicity at a minimum.

Petitioner's fourth point is that he was denied the effective assistance of his court appointed counsel. He lists a number of reasons alphabetically, and they will be taken up in that order, but first, in disposing of these complaints, it would be well to state just who such counsel were.

█ John F. McIlroy had been a practicing member of the Pike County Bar for 15 years, and is now the President of the Bar Association and Secretary of the Grievance Committee of the 11th Judicial Circuit. He is also President of the local bank and is interested in other business activities.

The other counsel, F. D. Wilkins, had been a practicing member of the Pike

County Bar for more than 45 years and had probably tried more criminal cases than any other attorney in the county during that time. He was recognized as the leading criminal lawyer of the county. Although it is true that lawyers in rural counties may not try as many criminal cases as their brethren in the larger cities, their knowledge of the law, and their intimate knowledge of the people of their community, render them far more effective than the big city criminal lawyer likely would be in their county.

Under subparagraph (a) petitioner complains that counsel "failed to request a continuance or a second change of venue prior to the date of the trial despite widespread bias and hostility in the community against the petitioner; * * *". The question of publicity has been previously discussed. On the change of venue question, it should be noted that one change of venue was granted to the defendant. Under the law of Missouri, (§ 545.540 V.A.M.S.) he was not entitled to another, so certainly the professional conduct of the lawyers could not be questioned because they failed to do that which the law denied them the right to do.

██ The granting of a continuance is largely within the sound discretion of the trial judge. From the record, I cannot see how a continuance would have benefited the petitioner. Certainly I cannot substitute my judgment for that of the trial judge and counsel who were familiar with every phase of the case.

Petitioner's next complaint is as follows:

"b.) Counsel failed to request the trial court to delay the petitioner's trial until an impartial panel of veniremen could be obtained despite the fact that, in order to compose a full panel of veniremen, the trial court called two jurors who admitted having formed opinions against the petitioner, when a full panel of impartial jurors might have been obtained by delaying trial and summoning additional veniremen; * * *".

This question has been fully discussed and settled under other paragraphs, and is entirely without merit.

Subparagraphs c and d are as follows:

"c.) Counsel neglected to exercise the petitioner's right to a full and complete panel of competent and impartial jurors's before peremptory challenges by consenting to and allowing the trial court to call two jurors who admitted having formed opinions aginst him;

"d.) Failed to adequately examine the jury panel concerning individual prejudices in the face of expressed hostility by panel members; * * *".

These complaints are matters that fall entirely within the jurisdiction of the trial court, and are clearly not questions that can be, or should be determined here.

Subparagraphs e and f state:

"e.) Counsel neglected to request the court to conduct a preliminary hearing or voir dire examination on the voluntariness of the petitioner's confession and the circumstances under which it was obtained, when the confession introduced into evidence constituted the major evidence used to convict the prisoner and counsel had knowledge of facts indicating that the document was involuntary in character;

"f.) Counsel neglected to request the court to instruct the jury on the voluntariness of the petitioner's confession and the circumstances under which it was obtained, when the confession introduced into evidence constituted the major evidence used against him."

Both of these questions have been previously discussed, and any other comment on them would be superfluous.

Subparagraph g complains:

"g.) Counsel permitted the prisoner to testify in his own behalf in apparent ignorance of the rule of impeachment by prior criminal record

when the petitioner's testimony, considered in its entirety, had no probative value and neither affirmed or denied the alleged offense with which he was charged; * * *".

The testimony of Mr. McIlroy, one of his attorneys at this hearing reveals that both of his attorneys advised against the defendant taking the stand in his own behalf, and advised him of the probable consequences thereof in view of his criminal record, but against their advice he did take the witness stand.

I suspect that no problem has given counsel for defense in criminal cases more real concern than that of whether or not his client should take the witness stand in his own behalf. This is particularly true when he has a record of convictions behind him. He is "damned if he does, and damned if he does not". Again these were questions for the determination of counsel and client. Defendant elected to testify knowing full well what the consequences would be.

The record reveals that after the petitioner replied to questions as to his name, the following questions were propounded to him:

"Q You are here charged with raping Janice Haarman—H-a-a-r-m-a-n. I will ask you this: Did you rape this child?

"A No, sir.

"Q Do you—I will put it this way—withdraw that—What recollection, if any, do you have—

"A (Interrupting) I don't have any—

"MR. WILKINS: (interrupting) Wait a minute until I get through asking you my question—

"Q (By Mr. Wilkins, continuing) —of occurrence on the 19th—on the 18th of October?

"A I have up to about 2 o'clock, I remember then.

"MR. GREWACH: Speak louder. I can't hear you.

"THE WITNESS: I say up to about 2 o'clock, I remember then.

"Q (By Mr. Wilkins) After that time, do you remember anything?

"A No, I don't.

"Q. Do you remember anything on the 19th?

"A. No, sir.

"Q When do you first remember of any definite thing respecting yourself after the 19th of October?

"A About the 20th.

"Q About the 20th? A. (Witness nods head)

"Q And where were you at that time?

"A In the Lincoln County jail."

Thereafter, the defendant was cross-examined as to his true name, the names under which he had gone, the various aliases that he had used. He was asked about his prior convictions. Out of the hearing of the jury, objection was made by counsel for defendant concerning questions respecting prior convictions because the question had theretofore been submitted to the court. In accordance with the requirements of Section 556.280 RSMo 1949, V.A.M.S., the court overruled the objection and admitted the evidence respecting the credibility of the witness. Thereafter, the witness was asked concerning prior convictions and the names under which he had been convicted, all of which he admitted.

Section 4, paragraph h and section 5 of the Petitioner's Statement of Points Relied On can be disposed of together. Paragraph h recites:

"h.) Counsel neglected to request the court to limit the use of evidence of the petitioner's prior criminal record to its use as impeaching evidence, notwithstanding the exhaustive use of evidence of the petitioner's criminal past in the presence of the jury, during both the State's case and the defendant's case."

Section 5 states:

"The petitioner was denied a fair and impartial trial because, notwithstanding the tremendous ad-

verse publicity suffered by him prior to his trial, the State was permitted to introduce evidence of the petitioner's prior criminal convictions in the presence of the jury during the State's case in chief thereby unduly accentuating the petitioner's criminal past, contrary to the established state procedure requiring a hearing on such matters out of the presence of the jury."

I find nothing in the record to indicate in the slightest degree that any evidence was introduced as to the defendant's prior criminal record during the State's case. The court was very careful to conduct the hearing as to the defendant's criminal record under the habitual criminal statute outside of the hearing of the jury, and this evidence was not submitted to the jury until the defendant took the witness stand. It then became competent for the purpose of affecting defendant's credibility.

To me there is absolutely no justification nor substance in the complaint of the petitioner that he was improperly represented by counsel. Counsel were able and distinguished lawyers in their community, and they performed their duties sincerely and honestly under their oath, and as officers of the court.

The sixth and last statement of Points Relied On is:

"6.) The petitioner's conviction contravenes the due process clause of the Fourteenth Amendment to the Constitution of the United States in that there was no evidence of penetration submitted by the State, with respect to the crime of rape, for which the prisoner was convicted."

Again petitioner seeks to make an appellate court out of the United States District Court. This court has no right to or intention of permitting that to be done. The Supreme Court of Missouri, in reviewing the facts, had this to say about penetration:

"She was taken to a hospital at once and examined, and her condition as described by the examining physician was such as to dispel any doubt of the fact that there had been penetration and extensive damage to the affected part by tearing."

Considering all of the evidence upon the trial of the case and the evidence that has been adduced at this hearing, I find no merit in the contention of the petitioner that his constitutional rights in any respect have been violated, and the Petition for Writ of Habeas Corpus is, therefore, denied and dismissed.